Argued and submitted April 26, affirmed August 16, 2023

Cody JOHNSON,
Elysia Johnson, Thomas Vogel,
Shealene Vogel, and Lane County,
*Respondents,*

*v.*

LANDWATCH LANE COUNTY
and 1000 Friends Of Oregon,
*Petitioners.*

Land Use Board of Appeals
2022066

Kimberly O'DEA,
John O'Dea, Bernard Perkins,
Theresa Iverson-Perkins, Thomas Vogel,
Shealene Vogel, and Lane County,
*Respondents,*

*v.*

LANDWATCH LANE COUNTY
and 1000 Friends of Oregon,
*Petitioners.*

Land Use Board of Appeals
2022067

A180799

536 P3d 12

Petitioners seek review of a final order of the Land Use Board of Appeals (LUBA) that reversed Lane County's revocation of a legal lot verification (LLV) that the county had approved ten years earlier. The county approved the LLV application in 2012, followed by a number of property line adjustments and forest template dwelling approvals. In 2022, the county revoked the 2012 LLV under Lane Code (LC) 14.090(8)(a)(iv) because it concluded that the LLV had been obtained by false or misleading information. A county hearings official upheld the revocation. LUBA reversed the hearings official and, thus, the county's decision to revoke the LLV, concluding that because the revocation occurred more than ten years after the LLV was approved, the revocation violated the statutory preference for finality in land use decisions. Lane County did not seek judicial review of LUBA's final order. Petitioners LandWatch and 1000 Friends of Oregon sought review of LUBA's final order arguing that the revocation was a permissible direct attack on the LLV, similar to an enforcement proceeding. They argued that the deeds submitted with the LLV application in 2011-2012 were fraudulent and that the county's interest in combating fraud in the land

use application process outweighs the state's interest in the finality of land use decisions. *Held*: LUBA was statutorily bound to enforce and prioritize finality as it applied land use law to the facts before it. The county's decision to revoke the LLV was inconsistent with, and worked against, finality. LUBA's conclusion that the revocation proceeding was an improper attack on the LLV because the issue raised in 2022 could have been raised and addressed in the 2012 LLV proceeding was not unlawful in substance.

Affirmed.


Sean T. Malone argued the cause and filed the brief for petitioners.

Gregory S. Hathaway argued the cause for respondents Kimberly O'Dea, John O'Dea, Bernard Perkins, and Theresa Iverson-Perkins. Also on the brief was Hathaway Larson LLP.

Zachary P. Mittge argued the cause for respondents Cody and Elysia Johnson. Also on the brief was Hutchinson Cox.

Matthew A. Martin, T. Beau Ellis, and Vial Fotheringham LLP filed the brief for respondents Thomas and Shealene Vogel.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagan, Judge.

MOONEY, J.

Affirmed.

**MOONEY, J.**

This land use case concerns the revocation by Lane County of a legal lot verification[1] (LLV) that it had approved approximately ten years earlier. The county approved John and Kimberly O'Dea's application for an LLV in 2012, followed by a series of property line adjustments and forest template dwelling[2] approvals. In 2022, the county invoked Lane Code (LC) 14.090(8)(a)(iv)[3] to revoke the 2012 LLV[4] because it concluded that the LLV had been secured by false or misleading information. A county hearings official upheld the revocation, concluding that the "[c]ounty has a duty to enforce the provisions of its land use code" and that "ignoring the egregious violations that have occurred in this case" was not a "viable option." The Land Use Board of Appeals (LUBA) reversed the decision of the hearings official, concluding that the county's use of LC 14.090(8)(a)(iv) to revoke the LLV was improper under the circumstances. Intervenors Landwatch Lane County and 1000 Friends of Oregon (collectively referred to as Landwatch) petitioned for judicial review of LUBA's final opinion. The county did not seek review and does not appear before us. We affirm.

## STANDARD OF REVIEW

We have jurisdiction pursuant to ORS 197.830. Landwatch challenges LUBA's final opinion and order as "unlawful in substance" under ORS 197.850(9)(a). We, thus, review "whether LUBA correctly applied the law." *Coopman v. City of Eugene*, 327 Or App 6, 10, 534 P3d 1105 (2023). In

---

[1] Lane Code (LC) 13.140 provides the process, submittal standards, and criteria for legal lot verification. Here, the O'Deas sought and received verification for three legal lots within their Springfield property.

[2] An application for a "forest template dwelling" is, essentially, a request for permission to build a home on a parcel of land located within a forest zone. *See* ORS 215.705 (criteria for forestland dwellings).

[3] LC 14.090 provides, as relevant:

"(8)(a) The Director may suspend or revoke a decision issued in accordance with this chapter for any reason listed in subsection (8)(a)(i) through (iv) below. ***

"*****

"(iv) The approval was secured with false or misleading information."

[4] The county also revoked seven other land use decisions that were based, at least in part, on the 2012 LLV. When we refer to the revocation of the 2012 LLV, we are referring to all eight revocations.

particular, Landwatch challenges LUBA's interpretation of the law and alleges that it exceeded its authority when it reversed the revocation decision. We review LUBA's interpretation of the law for legal error. *Id.* Our review is confined to the record that was before LUBA, and we do not substitute our judgment for that of LUBA's as to any factual issue. ORS 197.850(8); *Central Oregon LandWatch v. Deschutes County*, 285 Or App 267, 276, 396 P3d 968 (2017). The pertinent facts are drawn from the record and, unless otherwise noted, are undisputed.

## THE 2012 LEGAL LOT VERIFICATION

In December 2011, the O'Deas filed an application with the county seeking verification that three lots had been lawfully created within their Springfield property.[5] Kimberly O'Dea was an attorney who practiced land use law regularly in Lane County and with whom county staff were familiar because of that practice. In support of their application, the O'Deas submitted several deeds and property description cards to demonstrate that three discrete units of land had been established within their property in the early 1960s. The deeds that the O'Deas submitted did not, however, match the official deeds with the corresponding unique recording number on file with Lane County Deeds and Records. There were also multiple versions of the Lane County Assessment and Taxation department's property description cards (PDC) included with the application and materials.[6] The county did not notice the discrepancies in the deeds or the PDCs when it went through its verification process. Had county personnel compared the deeds submitted by the O'Deas with the county's deeds of corresponding recording numbers, the discrepancies would have been apparent. The county approved the application and issued its formal LLV in 2012, along with its notice of appeal rights.

---

[5] The ability to demonstrate that a unit of land was lawfully created is generally needed to obtain approval to build a home on that unit of land.

[6] The PDCs maintained by the county's tax department identify property by tax lot number. Each PDC contains the legal description of the represented tax lot and a list of the deeds by which the property was conveyed over the course of time. Those deeds are listed on the PDC by the unique recording number assigned to each deed when recorded by Lane County Deeds and Records. The PDC is, thus, a source of information that can be used to identify and pull deeds relevant to the verification process.

There was no appeal, and the LLV became final. Several lot adjustments and two applications to build forest template dwellings related to one or more of the legal lots verified by the county in 2012 were subsequently approved. Those subsequent land use decisions were not appealed, and they likewise became final.

## THE 2022 REVOCATION PROCEEDING

The county learned of the discrepancies in the deeds and PDCs about 10 years after the LLV was issued. It confirmed through forensic analysis that the deeds submitted by the O'Deas in support of their LLV application had been subjected to "cut and paste fabrications." At that point, the statutory period of ultimate repose to appeal the 2012 LLV had run.[7] The county concluded that the LLV had been obtained "with false or misleading information" and, therefore, it revoked the 2012 LLV under LC 14.090(8)(a)(iv).

The O'Deas and others with property interests that were affected by the revocation requested a hearing on the county's decision. The assigned hearings official upheld the revocation after the hearing, noting that "[f]ake deeds were used to obtain approval of two more dwellings than would have been lawfully allowed," and emphasizing the importance of protecting "the integrity of the County's land use system, in particular the regulations prohibiting constructing dwellings on properties that were not lawfully created." The hearings official granted the property owners' request for reconsideration but ultimately reaffirmed the county's revocation decision. The landowners, in turn, appealed to LUBA.

## THE LUBA APPEAL

On appeal before LUBA, the landowners assigned error to the revocation decision, arguing that the county had misconstrued the law or exceeded its jurisdiction because

---

[7] ORS 197.830 provides, as relevant:

"(6) The appeal periods described in subsections (3), (4) and (5) of this section:

"(a) May not exceed three years after the date of the decision, except as provided in paragraph (b) of this subsection.

"(b) May not exceed 10 years after the date of the decision if notice of a hearing or an administrative decision made pursuant to ORS 197.195 or 197.797 is required but has not been provided."

the decision to revoke was an impermissible collateral attack against the 2012 LLV.[8] They argued that the county's decision to revoke was inconsistent with the statutory preference for finality of land use decisions. According to the county, however, the doctrine prohibiting the collateral attack of land use decisions does not apply here because this was a direct attack against the 2012 LLV through a "revocation proceeding" initiated to annul the original land use decision as having been secured by false or misleading information. LC 14.090(8)(a)(iv). Landwatch agreed with the county, arguing that under LUBA's own case law, revocation proceedings are "akin to" enforcement proceedings and, as such, are direct challenges to prior decisions and not impermissible collateral attacks.

LUBA reversed the decision of the hearings official and, thus, the revocation decision. It highlighted the importance of finality in land use decisions, pointing to the state's policy that such matters be expeditiously and consistently decided according to sound principles of judicial review, codified in ORS 197.805:

> "It is the policy of the Legislative Assembly that time is of the essence in reaching final decisions in matters involving land use and that those decisions be made consistently with sound principles governing judicial review. It is the intent of the Legislative Assembly in enacting ORS 197.805 to 197.855 to accomplish these objectives."

LUBA specifically reasoned that:

> "Short deadlines for decision-making and appeal throughout the process, including expedited review of land use matters by local governments, LUBA, and the Court of Appeals, implement the policy."

In LUBA's view, it was improper for the county to use LC 14.090(8)(a)(iv) to revoke the 2012 LLV because, in doing so, the county effectively granted itself an unlimited

---

[8] A collateral attack "is an attempt to impeach the decree in a proceeding not instituted for the express purpose of annulling, correcting, or modifying the decree" or enjoining its execution. *Morrill v. Morrill and Killen*, 20 Or 96, 101, 25 P 362 (1890). Collateral attacks are not permitted because the court or other tribunal having jurisdiction over parties and subject matter "has a right to decide every question arising in the case, and, however erroneous its decision may be, it is binding on the parties until reversed or annulled." *Id.* at 102.

period of time in which to challenge a final land use decision. Finality is an established and important feature expressly incorporated into Oregon's land use laws. LUBA found that the revocation was impermissible because it was directly at odds with that state policy. LUBA stated that "the county may not use its revocation procedure to grant itself a 'second bite at the apple' [to] undo its error in approving the 2012 LLV." LUBA reversed the revocation as an "impermissible attack" on the 2012 LLV.

## THE ARGUMENTS ON JUDICIAL REVIEW

On review, Landwatch contends that LUBA erred by reversing the LLV revocation. It argues that the revocation was not an impermissible collateral attack against the 2012 LLV, but was instead a direct attack, "akin to an enforcement proceeding," and, as such, was permitted under LC 14.090(8)(a)(iv).[9] It argues further that, even if the county's revocation of the LLV can be properly characterized as a collateral attack, it was nevertheless permissible, because the county has an overriding interest in combating fraud in the land use application process. According to Landwatch, that interest outweighed the state's interest in the finality of land use decisions.

Respondents on review are the O'Deas and several others with current ownership interests in lots verified, or affected, by the 2012 LLV (collectively referred to as the landowners). The landowners appear in three groups, each separately represented. Although the groups have somewhat nuanced arguments on review, they are unified in their argument that the LLV revocation contravened Oregon's express statutory policy favoring finality in land use decisions. The landowners argue that the revocation upended a 10-year-old land use decision that set in motion the undoing of other land use decisions upon which they had each relied in making important and costly decisions in their personal lives. The landowners assert that LUBA's final opinion and order is lawful in substance because the county exceeded its authority when it used LC 14.090(8)(a)(iv) to revoke a final

_____

[9] As we will explain, LUBA did not conclude that the revocation was an impermissible collateral attack against the 2012 LLV.

land use decision, made 10 years earlier, that had never been appealed.

## ANALYSIS

Oregon's comprehensive land use laws were adopted, generally, to address threats posed to the environment and to the health, safety, prosperity, and welfare of Oregonians by the uncoordinated use of lands within the state. ORS 197.005(1). Our land use laws promote the coordinated use of lands through a system of comprehensive land use goals and plans adopted throughout the state with a clear process for compliance review. ORS 197.005(2).

As noted, the legislature has expressly declared that "time is of the essence in reaching final decisions in matters involving land use and that those decisions be made consistently with sound principles governing judicial review." ORS 197.805. That policy applies to land use matters generally. *1000 Friends of Oregon v. LCDC (Clatsop Co.)*, 301 Or 622, 628 n 4, 724 P2d 805 (1986). Finality brings certainty. Certainty in this context allows private and public entities as well as ordinary people to make important decisions about whether to sell or purchase real property and whether and how to develop and use that property. LUBA was correct when it stated that a primary "purpose of [the land use statutes] is to provide certainty in matters involving land use for local governments, developers, opponents, and those who hold an interest in land." There are many policies that no doubt play an important role in Oregon's legal land use system. Discouraging the fraudulent submission of information is surely among those. But speed and finality are the policies selected and expressly named by the legislature as "objectives" it intended "to accomplish" through the legal framework it established for land use decisions. *Id*.

LUBA was created as part of the comprehensive land use system and was delegated exclusive jurisdiction to review "any land use decision *** of a local government[.]" ORS 197.825(1). "By creating LUBA and giving it exclusive jurisdiction, the legislature created a body with particular expertise to review land use decisions ***. Quick disposition of disputed issues is also central to the statutory scheme."

*Simon v. Board of Co. Comm. Of Marion Co.*, 91 Or App 487, 489, 755 P2d 741 (1988). "[R]eaching final decisions" is also central to the statutory scheme. ORS 197.805. LUBA was statutorily designed as a specialized tribunal with the ability and capacity to render efficient and conclusive reviews of local and statewide land use decisions. Its design serves the statutory preference for speed and finality simply because it makes it possible for LUBA to quickly and conclusively deliver sound reviews of land use decisions.

We turn to Landwatch's arguments on review. Landwatch argues that the county's revocation of the LLV was a direct attack "akin to an enforcement proceeding[,]" and not an impermissible collateral attack on the LLV. The parties allocated much of their arguments to the task of characterizing the 2022 revocation as either a collateral attack or a direct attack against the 2012 LLV. As already mentioned, a collateral attack would not be permitted and, if LUBA had reached that conclusion, that would be the end of the inquiry. And yet LUBA did not decide whether the revocation proceeding was a collateral or direct attack, instead stating that "[w]hether a revocation proceeding constitutes a direct or a collateral attack is a distinction without a difference with respect to the policy of finality of land use decisions." We address the argument because LUBA rejected it as irrelevant, and our review of the lawfulness of LUBA's opinion would fall short if we did not consider the arguments the parties placed before it—and us—on that question.

As we understand Landwatch's argument, it does not analogize the revocation proceeding to an enforcement proceeding—a direct attack—to suggest that LUBA exceeded its jurisdiction in reviewing the county's decision to revoke the LLV. We note that under ORS 197.825(3), the circuit courts retain jurisdiction to enforce LUBA's orders, but LUBA has exclusive jurisdiction to review land use decisions. Importantly, the circuit courts do not have jurisdiction over issues that could have been "resolved through the [county's] land use decision and through an appeal to LUBA from that decision." *Doney v. Clatsop County*, 142 Or App 497, 502, 921 P2d 1346 (1996) (internal quotation marks

omitted). Given that Landwatch asserts that we have jurisdiction to review LUBA's final order under ORS 197.850(3)(a), which provides for judicial review of *land use decisions* under ORS 197.830, we infer that it does not contend that LUBA was without authority to review the decision to revoke the LLV.

In its final opinion and order, LUBA acknowledged that its review of the hearings official's order was not "an appeal under ORS 197.830(3), (4), or (5)" and that, therefore, "the periods of ultimate repose in ORS 197.830(6) do not apply." It nevertheless considered the time limitations set forth in ORS 197.830(6) as a guide when it applied the principle of finality to the facts before it. The analogy is logical. If 10 years is the ultimate time limitation for reviews of land use decisions made without a hearing or where the decision is so different from the proposal described in the notice that the notice is ineffectual,[10] then such a time limit would seem to fit here where the decision being revoked had been settled for over 10 years. The fit is exceptionally good here where it was the decision-maker who changed its mind without advance notice, based on information that, as we will explain, it had in its possession when it made the original decision and throughout the 10 years that had since passed.

It is clear that when the county initiated the revocation proceeding against the 2012 LLV in 2022, its attack was direct. *See Morrill v. Morrill and Killen*, 20 Or 96, 101, 25 P 362 (1890) (describing a "collateral attack" as "any proceeding *not* instituted for the express purpose of annulling, correcting, or modifying such a decree," or enjoining its execution) (emphasis added). But the fact that the county's attack on the LLV was direct, rather than collateral, does not mean that LUBA's conclusion that the county may not use LC 14.090(8)(a)(iv) to revoke the final LLV was unlawful in substance. LUBA's final order and opinion addressed the argument when it stated that its decision did not hinge on the distinction between the attack as collateral or direct.

In discerning whether the county's revocation of the LLV in 2022 was permissible, LUBA considered whether

---

[10] *See* ORS 197.830(3), (4), and (5) for the description of the types of hearings to which the periods of limitations defined in ORS 197.830(6) apply.

the reason for the attack concerned an issue that could have been raised during the original LLV process in 2012. That is because "[a] land use dispute must be raised at the time of the land use process, not later in the guise of another proceeding." *Flight Shop, Inc. v. Leading Edge Aviation, Inc.*, 277 Or App 638, 649, 373 P3d 177 (2016). LUBA found that the "altered deeds were in the record" during the 2011-2012 LLV proceeding and that the "authenticity" of those deeds "could have been decided" in that proceeding. The record supports that finding and the parties do not challenge it. LUBA then concluded that the county "may not use its revocation procedure to grant itself a 'second bite at the apple' ***." We understand that to be a colloquial expression of LUBA's conclusion that the county's ability to resurrect a final decision, and change it, is limited by the passage of time, and that the maximum amount of time allowed is informed, at least in part, by whether it could have addressed the issue back at the time of its original decision.

Landwatch does not agree with LUBA's characterization of this as a case of county error or mistake. Instead, Landwatch characterizes this as a case of fraud—"where a well-known land use attorney meticulously orchestrated a fraud upon the County[.]"[11] In support of that assertion, Landwatch relies on a finding by the hearings official that the "doctoring" of the deeds and PDCs "was so well done" that it was not discovered until years later. Ultimately, Landwatch argues that LUBA incorrectly weighed the importance of finality against the importance of allowing a direct attack on a prior decision that was based upon fraud. One problem with that approach is that there has been no allegation, or finding, of fraud here. The hearings official expressly disagreed that "this case is akin to a fraud case," and LUBA did not conclude otherwise. In fact, LUBA concluded that "[w]hether the county's error in approving th[e LLV] application was based on mistake or fraud is not material."

The code provision invoked by the county to revoke the LLV authorizes revocation of a decision where it is

_____

[11] The attorney referred to is Kimberly O'Dea, but as we explain, there has been no finding of fraud with respect to her or anyone else on this record.

established that the decision was secured on the basis of false and misleading information. There is certainly undisputed evidence that the deeds submitted by the O'Deas in 2011 had been altered by someone and that they did not match the official deeds that were on file with the county at that time. But there are questions about who created those deeds, and it is not clear on this record why the inaccurate deeds were submitted with the LLV application. The county had in its possession the materials submitted by the O'Deas, and it had access to the recorded deeds in its Deeds and Records office. The county apparently did not compare those records as it processed the LLV application.[12]

Fraud was neither alleged nor proved, and the county did not verify the accuracy of the deeds *against its own records* before verifying that the property described in those deeds had been lawfully created through the conveyances documented by those deeds. Discouraging fraud in the filing or submission of documents to a governmental agency is surely a valid public policy. But, unlike finality, it is not one expressly incorporated by the legislature into the land use laws as a specific objective of the statutory scheme. LUBA was statutorily bound to enforce and prioritize finality as it applied the law to the facts before it. We, thus, reject the argument that LUBA incorrectly weighed the importance of finality against the value of combating fraud in land use cases.

When the LLV application was approved in 2012, the Lane County code required the county's land management

---

[12] We infer from the hearings official's view of the county's role in reviewing application materials in the verification process that, in fact, the county did not review the property descriptions and deeds submitted with the application for accuracy before verifying the legality of the lots as requested:

"Before this appeal came before the Hearings Official, the Hearings Official never would have imagined that anyone would consider doing what has been done in this case. One can only assume the same is true of County staff, then and now. If County staff were called upon to check every deed presented with an application against the deeds recorded in deeds and records, the County would be unable to conduct business. And the Hearings Official sees no way for County staff at the time to have discovered that the deeds were doctored other than comparing every deed presented against the deeds recorded at Deeds and Records."

While the record supports a finding that the county did not compare the deeds in question, it does not support the determination that the county could not have done so because of work volume or any other reason.

director to "make, or cause to be made, an investigation *** to ensure that the action on each application" meets the criteria established for legal lot verification. LC 14.050(4) (2010).[13] That general process has not changed. *See* LC 13.140; LC 14.030(1) (2020).[14] LLV applications "will be approved if the subject property is a lawfully established unit of land[.]" LC 13.140(3). Here, the county had the same information in 2022 as it had in 2012. The county's ability to verify the legality of the property was as feasible in 2012 as it was in 2022. LUBA's conclusion that the revocation proceeding was an improper attack on the LLV because the issue raised in 2022 could have been raised in the 2012 LLV proceeding was not unlawful in substance.

Landwatch relies on a series of LUBA cases in which LUBA affirmed a local government's decision to revoke an existing permit or an earlier land use decision to support its view that LUBA's reversal of the county revocation here was unlawful in substance. But those cases are distinguishable because they concern revocations based on violations of conditions of approval and not on the propriety of the approval itself. *See*, *e.g.*, *Woods v. Grant County*, 36 Or LUBA 456, *aff'd*, 164 Or App 177, 991 P2d 65 (1999) (affirming the county's revocation of a final zoning decision because the landowner did not follow conditions of approval when building a guest house); *Howard v. City of Madras*, 41 Or LUBA 122 (2001) (affirming city's revocation of approval for a site plan due to failure to comply with conditions of approval).

Landwatch also relies on ORCP 71, by analogy, to support its argument that a direct attack on a final decision on the ground of fraud is permissible, even after the time for appeal or review has passed. Landwatch focuses on ORCP 71 C which provides, in part, that "[t]his rule does not limit the inherent power of a court to *** set aside a judgment for fraud upon the court." First, LUBA was correct that this "is not a civil proceeding, and ORCP 71 C is not applicable." *See Pfeifer v. City of Silverton*, 146 Or App 191, 195, 931 P2d 833

---

[13] In 2020, the county amended and replaced chapter 14 of its Code. *See* Ordinance No. 20-05.

[14] *See*, *e.g.*, LC 14.030(1)(a)(iii) ("*** the Director will review the application for compliance with all applicable land use standards and regulations and adopted plans").

(1997) (explaining that, although the ORCPs may be instructive, they do not bind LUBA). Second, because LUBA is not a court, reliance on ORCP 71 C to support an inherent authority argument is misplaced. Finally, as already explained, the revocation proceeding did not allege fraud. Questions about inaccurate and altered deeds certainly exist on this record, but even under ORCP 71, a motion to set aside a judgment for mistake, neglect or fraud has time limitations. LUBA's rejection of the analogy was not unlawful.

Finally, to the extent that Landwatch makes a deference argument under *Siporen v. City of Medford*, 349 Or 247, 243 P3d 776 (2010), the question of whether the county could use its own code provision to raise an issue that could have been raised in the original land use proceeding involves the interpretation of state land use laws to which no local deference is owed. And, in any event, the county's final decision was issued by a hearings official, whose interpretation of local law is not entitled to deference. *Gage v. City of Portland*, 133 Or App 346, 349-50, 891 P2d 1331 (1995) (no "deferential weight" is accorded to an "interpretation by a local entity other than the governing body.")

## SUMMARY AND CONCLUSION

LUBA concluded that the county's reliance on LC 14.090(8)(a)(iv) in 2022 to revoke the LLV was an impermissible attack on that LLV because it contravened the express policy objective of finality in land use decisions given the passage of time. The county's challenge to the LLV was a challenge to the propriety of the decision to verify the legal lots in the first place. LUBA determined that, on this record, the county's decision to revoke the LLV more than 10 years after it had first approved it violated the statutory preference for finality of land use decisions. And, further, LUBA clarified that the county's use of its own local code provision to accomplish that which would have been barred under state land use laws as untimely was improper. Indeed, the county's decision to revoke the LLV was not only inconsistent with finality, but it also worked against finality. LUBA's order is not unlawful in substance.

Affirmed.